FERDINAND SIEGEL *et al.*

*v.*

HARRIET BLAIR BORLAND.

*Opinion filed June 19, 1901.*

1. MORTGAGES—*purchaser of mortgaged property not personally liable unless he assumes the debt.* The purchaser of mortgaged premises is not personally liable for the debt in case of a deficiency unless there is a contract upon his part, express or implied, amounting to an agreement to pay the mortgage debt or some part thereof.

2. SAME—*a promise to pay mortgage debt may be implied.* If the amount of an encumbrance is included in and forms a part of the consideration which a grantee promises to pay for the premises, and he retains that part of the purchase price, the law will create a personal liability against him, upon the ground that he has agreed to pay such indebtedness.

3. SAME—*encumbrance must be expressly assumed or amount must be allowed in purchase price.* In order to create a personal liability on the part of the purchaser of mortgaged premises there must be an express assumption of the indebtedness or the amount must be allowed in the purchase price, so that the law will imply a promise.

4. SAME—*an implied promise cannot exist where there is a contrary express agreement.* The implied contract to pay to the holder of an encumbrance money retained for that purpose by the grantee, arises only from the presumed understanding of the parties, and cannot exist where there was an express understanding to the contrary and a distinct refusal by the grantee to pay the debt.

*Siegel* v. *Borland*, 93 Ill. App. 320, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. ELBRIDGE HANECY, Judge, presiding.

BINSWANGER & JACKSON, and JAMES E. MUNROE, for appellants.

WILSON, MOORE & McILVAINE, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court: ·

The appellee, Harriet Blair Borland, and Frederick W. Crosby, as trustee, filed their bill in this case in the circuit court of Cook county to foreclose a trust deed made by Louise C. Clark and husband, conveying to said trustee a lot with an apartment building thereon, known as "The Cambridge," to secure a note for $75,000, with six per cent interest. The bill as finally amended sought to hold subsequent owners of the property personally liable for the debt, and charged that the premises were conveyed to Annah B. Peck, who conveyed the same to Thomas B. Bryan, who in turn conveyed them to Howard P. Simmons, and that each of the successive grantees expressly agreed to pay said debt secured by the trust deed. It was also sought, upon other grounds, to hold the appellants, a corporation known as "The Grand," Ferdinand Siegel and Joseph Siegel, and one Maximilian Philipsborn, liable for said debt. The facts alleged as the basis of such liability were, that said Simmons, for an expressed consideration of $160,000, conveyed the premises to Maximilian Philipsborn, who purchased them for and on behalf of appellants Ferdinand Siegel and Joseph Siegel; that Philipsborn conveyed the premises for the same expressed consideration to said Ferdinand Siegel and Joseph Siegel; that said Philipsborn and Joseph Siegel and Ferdinand Siegel were the owners of all the stock in said corporation, The Grand; that the contract for the purchase of the premises was made by The Grand for the consideration of a stock of goods and fixtures transferred to Simmons and valued at $125,000; that The Grand demanded payment of Simmons of said $25,000 to

apply on the indebtedness secured by the trust deed, and Simmons paid the same; that said $25,000 was paid to said Philipsborn and said Ferdinand Siegel and Joseph Siegel, the stockholders of The Grand, who were the real parties in interest, and that by virtue of said facts the said corporation and parties became personally liable to pay the debt. Philipsborn and the appellants, Ferdinand Siegel, Joseph Siegel and The Grand, answered, denying all liability for the debt.

The cause was referred to a master in chancery to take the evidence and report it, with his conclusions. The master's report showed the amount due on the trust deed and for solicitor's fee, which, with interest to the date of the decree for sale, amounted to $89,641.64. The property sold for $50,000, and, with interest from the date of the decree and the costs of suit and sale, there was a deficiency of $41,357.84, for which there was a personal decree against the Clarks, Annah B. Peck, Thomas B. Bryan and Howard P. Simmons. There is no controversy about those decrees or the sale. The only point contested before the master or the court related to the personal liability of appellants and Philipsborn for any part of the debt secured by the trust deed. The master reported that The Grand was liable for the deficiency because it had the land and $25,000 paid by Simmons with which to pay the debt. He also reported that the actual consideration passing from Ferdinand Siegel and Joseph Siegel to The Grand for the same money and property conveyed to them was the payment of a merchandise indebtedness of The Grand of $28,000, and an understanding that they would credit The Grand, on account of its indebtedness to them, with whatever they might realize out of The Cambridge, and therefore their position towards Simmons was the same as that of The Grand, and they were personally liable. His further conclusion was, that even if that were not so, Ferdinand Siegel, Joseph Siegel and Philipsborn, as directors of The Grand,

incurred liabilities in excess of its capital stock and were personally liable under the Corporation act, and, for the purpose of avoiding unnecessary litigation, their liability could properly be enforced in this suit. There was no statutory liability charged against the parties as stockholders of The Grand, and there was no issue of that kind referred to the master.

The circuit court sustained exceptions to the master's report, but found that Ferdinand Siegel, Joseph Siegel, Philipsborn and The Grand received from Simmons $25,000, to be used, by agreement between the parties, for the express purpose of paying the same on the trust deed, and that said parties were liable for said sum, with interest from January 20, 1897, at six per cent until the maturity of the note secured by the trust deed, and seven per cent thereafter to the day of sale. The court again referred the cause to the master to state the amount for which said parties were liable. The master reported and the court entered a decree against them for $29,502.78, the interest having been computed as directed. Appellants and Philipsborn removed the record to the Appellate Court by appeal. The Appellate Court held the decree erroneous only as to the time for which interest was computed and in computing it at a higher rate than allowed by law, and appellee having remitted the excess of interest, amounting to $1978.49, the decree was affirmed for the balance. The case is here by appeal from the judgment of the Appellate Court.

The agreement for the purchase of The Cambridge and the exchange of the properties was in writing, and was made January 20, 1897. It was signed by Howard P. Simmons and by the corporation, The Grand, through its president, under its corporate seal, attested by its secretary. The deed from Simmons and wife to Maximilian Philipsborn was made in pursuance of the contract and a resolution of the directors of The Grand, as trustee for the corporation, and neither in the contract

nor in the deed, nor in the subsequent deed to the Siegels, was there any assumption whatever of the debt secured by the trust deed or any agreement to pay it or any part of it.    The deed was to be made, and was made, subject to the trust deed.  The contract and deed not only failed to imply any assumption of the debt, but rather excluded the implication.  Complainant can only establish the liability of appellants by proving a contract to assume and pay the debt, or some part of it.    To sustain the decree, the facts proved must amount to an agreement to pay the $25,000 upon the debt secured by the trust deed.  It is true that a contract may be implied, and that if the amount of an encumbrance is included in and forms a part of the consideration which a grantee promises to pay for premises, and he retains that part of the purchase price, the law will create a personal liability against him, on the ground that he has agreed to pay such indebtedness.  In such a case the law presumes that the grantee has agreed to apply the money so retained for the purpose of paying the encumbrance.  Either there must be an express assumption of the indebtedness, or the amount must be allowed in the purchase price so that the law will imply the promise. (*Comstock* v. *Hitt*, 37 Ill. 542; *Hammer* v. *Johnson*, 44 id. 192; *Fowler* v. *Fay*, 62 id. 375; *Rapp* v. *Stoner*, 104 id. 618; *Drury* v. *Holden*, 121 id. 130; *Consolidated Coal Co.* v. *Peers*, 166 id. 361; *Crawford* v. *Nimmons*, 180 id. 143.)  In this case there was no retention by the grantees of any part of the agreed purchase price for the encumbered property.  The transaction consisted of a trade, in which Howard P. Simmons conveyed The Cambridge, subject to the trust deed, and block 44 in Cornell, to Philipsborn, as trustee for The Grand, and paid $25,000 in cash and notes, and assumed the leases on the premises occupied by The Grand, at the corner of State and Adams streets, in Chicago.  The consideration given to Simmons was the stock of merchandise of The Grand and other merchandise, to bring the amount, at invoice prices, up to

$95,000, and fixtures valued at $30,000, and the leases on the premises held by the Siegels. The $25,000 was received as a part of the consideration for the merchandise and fixtures transferred to Simmons and not retained out of the consideration for The Cambridge.

The claim of appellee is, that the Siegels and Philipsborn, who were the only stockholders of The Grand, found that the trust deed for $75,000 could not be renewed for more than $50,000 and thereupon demanded that $25,000 should be paid to them to reduce the encumbrance to $50,000. It is contended that this placed them upon the same basis as one who retains a part of the purchase price for the purpose of paying it upon an encumbrance. If that is so, any presumption or implication of the law from such fact was met in this case by proof that the parties utterly refused to assume any part of the mortgage, and before the contract was drawn said that under no circumstances would they assume it or any part of it. The implied contract to pay to the holder of an encumbrance money retained for that purpose arises only from the presumed understanding of the parties. It is implied because the facts justify the inference that such was the mutual intention; but an implied contract can not exist when there is an express one about the same subject matter. It is only where the parties do not expressly agree that the law implies a promise. (*Walker* v. *Brown*, 28 Ill. 378; 15 Am. & Eng. Ency. of Law,—2d ed.— 1078.) In this case there was an express agreement and a distinct refusal to pay any money on the debt. The parties concerned in the transaction were Howard P. Simmons, who executed the written contract and made the deed; John C. Stetson, his attorney; George F. Montgomery, who had an interest with Simmons in the transaction, but who, on account of his financial condition, transacted business in the name of his wife and acted as agent in the matter; Joseph Siegel, Ferdinand Siegel, Maximilian Philipsborn, and their attorney, Augustus

Binswanger. With the exception of Montgomery, these parties united in testifying that the Siegels and Philipsborn refused to make the trade if the mortgage had to be assumed by them, and that they did not assume it. Montgomery does not contradict any of this testimony, and there is no evidence tending to prove the contrary. The trade was pending for two or three weeks, and the ground for claiming an assumption of the debt to the extent of $25,000 is, that during that time, before the written contract was made, appellants demanded the $25,000 to reduce the mortgage debt. It seems the Siegels proposed to see Mr. Blair, the agent for appellee, to see if the mortgage could be renewed when due, and they learned from him that he would not renew it for more than $50,000. They also sent an architect to examine the property and report upon its value, and from the report of the cost of the building and refusal to renew the mortgage they refused to go on with the trade at the original figures and demanded $25,000 in money. Simmons proposed to pay part of it in money and give notes for part, and his proposition was accepted.

Appellants objected to the oral evidence of these facts as varying the terms of the written contract, and they also say that the allegations and proofs do not agree, but as we are of the opinion that the evidence does not sustain the decree it will not be necessary to notice those questions.

If all the evidence is considered it will not warrant fastening any liability upon the appellants. It is impracticable to go into the testimony at length. George F. Montgomery testified that when it was found that the mortgage could not be renewed for more than $50,000, the Siegels refused to close the deal unless Simmons would pay $25,000 in cash. His evidence is very uncertain and unsatisfactory, and he said that it was difficult for him to remember the details of the affair at all. While he said the Siegels would not trade unless Simmons

would pay off $25,000 of the mortgage, he also said that they demanded the $25,000 to pay debts of The Grand. On his attention being called to the two statements he said they were both correct, and further, that the Siegels told him they did not place any value on the equity in The Cambridge,—that they simply wanted to trade it off; that their object in making the trade was to get rid of the leases on the building occupied by The Grand; that they had four or five years to run, at an annual rental of $40,000, and that they had no use for the property, and the trade was to get Simmons to assume the leases. Thomas B. Bryan testified to admissions of the Siegels long after the transaction, which are emphatically denied by them. Bryan had assumed the debt, and testified that he read to Joseph Siegel part of a letter written by William A. Simmons, (father of Howard P. Simmons,) who was interested in some way in the transaction, to George F. Montgomery, in which Simmons said that Bryan was in a good deal of trepidation about the affair; that he told Bryan whatever was paid in cash was paid to enable the parties to reduce the mortgage on The Cambridge $25,000; that his remembrance was that they had not assumed the mortgage, but nevertheless the understanding was that the money should be applied in that way. The witness testified that when he read this Joseph Siegel said that was all right. Bryan was interested in obtaining an admission, and was arguing with the Siegels about the law, to convince them of their liability. His testimony is subject to the well known rule that testimony of verbal admissions is to be received with caution. A letter of Mr. Stetson, the attorney, to said W. A. Simmons was in evidence, stating that there was no agreement of the Siegels to pay the mortgage, but they must eventually pay it or lose what they had put into the property. Howard P. Simmons, who made the contract and deed, testified that nothing was said to him and he did not learn anything about the application

of the $25,000 that he paid, to The Grand, and that when the parties refused to make the trade if the mortgage was to be assumed by them, he said he would forego the assumption of the mortgage in order to carry through the deal. All the other parties to the transaction deny that the money was to be applied on the mortgage. The one who paid the money and those who received it say it was not paid to be applied on the debt, and they are the parties between whom it is sought to raise an implied contract.

After whatever talk there was about the $25,000 the written contract was made. The substance of it is, that Simmons was to convey his property subject to the trust deed, and pay $25,000 in cash and notes and assume the leases. He was to receive the merchandise at $95,000 and allow $30,000 for the fixtures, making $125,000. In the lengthy preamble to the contract it is said that the purchase price of the property conveyed by Simmons was fixed at $200,000, less the amount of the trust deed, of $75,000. The deed of The Cambridge, when made, recited a consideration of $160,000, and was made subject to the trust deed, and the deed of block 44 was in consideration of $15,000. It seems to be claimed that in some way the figures given in the contract prove that the $25,000 was to be applied on the mortgage. The evidence was that the transaction was simply a trade of properties,—so much goods and fixtures for the equity and block 44 and cash,—and the consideration was a matter of indifference, except so far as it was desirable to state a good consideration for the property which the parties expected to trade with. Howard Simmons testified that the equity in The Cambridge was valued at $85,000, block 44 at $15,000, and the $25,000 cash and notes equaled the stock and fixtures of The Grand,— $95,000 for the merchandise and $30,000 for the fixtures. In the contract the Simmons property was priced at $200,000, and it is said that the merchandise being $95,000,

the fixtures $30,000 and the mortgage $75,000, made up that amount, and that the expressed consideration in the deeds, $160,000 for The Cambridge and $15,000 for block 44, amounted to $175,000, which is $25,000 less than the price fixed in the contract for the Simmons property. It is true that the considerations in the deeds amount to $25,000 less than $200,000, but that fact does not tend to prove the theory of appellee. All that fact tends to prove is, that when Simmons made the deeds he put the considerations less than in the contract by $25,000 and made up the difference with the cash and notes, and that corresponds with the figures in his testimony. Taking the Simmons property at $200,000, subject to the mortgage of $75,000, the equity would be $125,000, and the merchandise and fixtures amounted to $125,000. When Simmons paid the $25,000 it simply increased the amount he was giving from $125,000 to $150,000. According to that theory he was giving $150,000 for goods and fixtures worth $125,000. The assumption that the $25,000 was paid to reduce the mortgage to $50,000 does not complete the equation or add to the probability of appellee's claim. If the Simmons property was worth $200,000 and the mortgage reduced to $50,000, the equity would be $150,000. All that the evidence proves is, that the Siegels concluded not to trade unless they got $25,000 more than they had proposed to take, and Simmons was willing to pay that much more to get rid of his property. The evidence did not justify the court in finding that there was an agreement to pay the $25,000 on the mortgage.

The judgment of the Appellate Court and the personal decree of the circuit court against the appellants are reversed and the cause is remanded to the circuit court, with directions to modify its decree accordingly.

*Reversed and remanded.*